In re **Estate of**
Edives S. **Imamura**, Deceased.
Appeal No. 95-007
Civil Action No. 89-1009
May 1, 1997

---

[2] *See* Manalisays Response Brief, No. 96-024, at 5, 8.

Submitted May 2, 1996

Counsel for Appellants: Paul A. Lawlor, Saipan.

Counsel for Appellee: Theodore R. Mitchell and Jeanne H. Rayphand, Saipan.

BEFORE: TAYLOR, Chief Justice, VILLAGOMEZ, Justice and MACK, Special Judge

VILLAGOMEZ, Justice:

¶1 ▉ Appellants, certain heirs of Edives S. Imamura who are not of Northern Marianas descent ("non-NMDs" or "non-NMD grandchildren"), appeal a Superior Court order distributing the real property in Edives's estate only to her heirs of Northern Marianas descent ("NMDs" or "NMD heirs") on the basis that Article XII of the Commonwealth Constitution prohibits non-NMDs from owning land in the CNMI.

We have jurisdiction under title 1, § 3102(a) of the Commonwealth Code. We affirm.

### ISSUE AND STANDARD OF REVIEW

¶2 ▉ Whether, under Article XII, the non-NMD grandchildren of Edives, who died intestate prior to February 1984, may inherit less than permanent or long term interest in her estate's land. This is a question of law

reviewable de novo.[1]

### FACTUAL and PROCEDURAL BACKGROUND

¶3 On April 24, 1983, Edives died intestate. She had seven children, five of whom are NMDs who survived her. Two of the children, Jack S. Imamura and Maria M. Ohgushi, predeceased Edives. Jack and Maria both have heirs (the appellants), all of whom are citizens of Japan and are non-NMDs.

¶4 On February 8, 1994, a co-administrator of Edives's estate filed an amended petition seeking distribution of nine parcels of land in Rota only to Edives's NMD heirs. The non-NMD grandchildren objected, arguing that Article XII does not prevent them from inheriting interest in land that is not "permanent" or "long term." Moreover, the non-NMDs asserted that they must be given the maximum allowable interest permitted by Article XII as a matter of judicially created intestate distribution, conforming to subsequently enacted 8 CMC 2411[2].

¶5 The Superior Court held that § 2411 of the probate code does not apply retroactively, and that Article XII bars the non-NMD's from receiving land from the estate. The non-NMDs timely appealed.

### ANALYSIS

¶6 The only issue addressed by the Superior Court was, "Whether 8 CMC § 2411 may be applied retroactively so that non-NMD [grandchildren], who are barred by Article XII from owning land in the CNMI, may take a 55 year leasehold interest in [the] intestate decedent's real property."[3] The court answered this question in the

---

[1] *Estate of Tudela*, 4 N.M.I. 1, 2-3 (1993); *Manglona v. Civil Serv. Comm'n*, 3 N.M.I. 243, 246 n.2 (1992).

[2] This provision reads:

> Whenever a person not of [NMD] takes title to real property under this code, he or she shall take the maximum legal interest in this property and the remaining interest if any shall vest in the next closest heirs or devisees who can legally take title to the real property pursuant to Article 12 of the . . . Constitution.

8 CMC § 2411. No one challenged the constitutionality of Article XII, § 4, which requires U.S. citizenship or national status for a person to qualify as an NMD. Therefore, although the requirement of U.S. citizenship in order to own land may raise a constitutional issue, we decline to address such issue *sua sponte*.

[3] *Estate of Imamura*, P. Action No. 89-1009 (N.M.I. Super. Ct. Feb. 17, 1995) (decision and order granting petition for partial

▉

negative, holding that § 2411 does not apply under the facts of this case.[4] We will discuss whether, as the non-NMDs contend on appeal, the Superior Court erred in failing to distribute to each of them a real property interest which is less than permanent or long-term within the meaning of Article XII.

¶7 ▆▆ Edives died in 1983. The law in effect at that time was, as the Superior Court correctly noted, the Trust Territory Code (TTC). The TTC, however, does not specify how an intestate decedent's property should be distributed.[5] The TTC contains a general provision giving full force and effect to "[t]he recognized customary law of the various parts of the Trust Territory . . . so far as such customary law is not in conflict with the laws [made applicable to the Trust Territory through the TTC]."[6] The Trust Territory Bill of Rights similarly mandates that "[d]ue recognition shall be given to local customs in providing a system of law, and nothing in this [Bill of Rights] shall be construed to limit or invalidate any part of the existing customary law, except as otherwise provided by law."[7]

¶8 Edives was Chamorro. The Superior Court, therefore, held that her estate must be probated in accordance with

Chamorro customary law, pursuant to which each of Edives's seven children, or their heirs by representation, normally would be entitled to a one-seventh share of Edives's estate.[8] Both parties agree that, except for Article XII, both the non-NMDs and the NMD heirs would receive equal shares of land ownership in fee simple, under Chamorro custom. The Superior Court, therefore, properly applied Chamorro customary law in the probate of the estate, subject to Article XII.[9]

¶9 ▆▆ Under Chamorro customary law, where a person does not make his or her wishes known prior to death, his or her surviving children, and the heirs of any deceased issue by representation, will either take equal portions of the estate in fee simple or agree to a distribution that is not necessarily equal.[10] Thus, except for Article XII, each of Edives's seven children, or their heirs by representation, normally would be entitled to a one-seventh fee simple interest in Edives's land. Here, however, because the heirs of two of Edives's children are non-NMDs, they cannot acquire "permanent [or] long-term interests"[11] in real

---

▆▆▆▆▆▆
distribution at 3).

[4] Although not mentioned by the Superior Court or any of the parties in this action, the Superior Court had previously found § 2411 to be unconstitutional. *Estate of Tudela*, Civ. Action No. 86-884 (N.M.I. Super. Ct. May 22, 1992) (Order at 8, 9. and 10). *rev'd on other grounds*, 4 N.M.I. 1 (1993), appeal dismissed, No. 93-16486 (9th Cir. Nov. 18, 1994). However, the constitutionality of § 2411 is not before us today. In *Estate of Tudela*, the court stated:

> In reality, section 2411 is an effort to amend the Constitution without following the proper procedure . . . . In operation, 8 CMC § 2411 would act as a type of legislative reformation provision allowing the court to transform a fee simple or long-term interest that violates article XII into one that does not . . . . Therefore, section 2411 cannot be applied to reform intestate distributions without violating article XII. Any other desired construction of article XII would require constitutional amendment. The legislature, like the judiciary, has no power to reform acquisitions of land that violate article XII.

*Estate of Tudela*, Order at 8. 9 and 10.

[5] *See* 13 T.T.C. § 1 et seq. (Michie Co. 1980) (probate law and procedure).

[6] 1 TTC § 102 (Michie Co. 1980).

[7] 1 TTC § 14 (Michie Co. 1980).

---

[8] The non-NMD grandchildren do not challenge either of these two holdings.

[9] *Kapileo v. Olopai*. 8 T.T.R. 259, 263 (T.T. High Ct., App. Div. 1982) (holding that trial court did not err in applying common law, but noting that Chamorro customary law also could have been applied); *Ngiramulei v. Rideb*, 2 T.T.R. 370. 373-74 (T.T. High Ct., Tr. Div. 1962) (holding that trial court did not err in basing decision on local customary law rather than common law); *Estate of Cabrera*. 2 N.M.I. 195, 203-04 (1991).

[10] *Estate of Cabrera*. 2 N.M.I. 195, 203 (1991) (dictum). In *Cabrera*, we stated that when parents died intestate (without performing a partida) the heirs must divide the parents' land by their own agreement. In this case, under Chamorro custom, the NMDs may agree to give the non-NMDs whatever interest Article XII does not prohibit. The court, however, has no legal basis to force such an agreement upon the children and grandchildren.

[11] Under the Commonwealth Constitution, permanent interests in real property include freehold interests and leasehold interests of longer that fifty-five years including renewal rights. N.M.I. Const. art. XII, § 3.

Freehold interests include all types of ownership or title granted by all types of deeds, wills, or by intestate succession, in the following: (1) freehold estates of inheritance which are fee simple absolute, fee simple determinable, fee simple subject to a condition subsequent, fee simple subject to an executory limitation, fee simple conditional and fee tail. and (2) freehold estates not of inheritance which are estates for one's own life, estates for the life of another, and estates for one's own life and the life of another. ANALYSIS OF THE CONSTITUTION OF THE COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS, 169 ▆▆▆▆▆▆

property within the Commonwealth through inheritance. Nor have the NMD heirs, through custom, agreed to give them land interests which are permissible under Article XII. The trial court correctly concluded that, because of Article XII, the non-NMDs could not inherit any land in Edives's estate.[12]

¶10 The non-NMDs contend that the trial court should have distributed a non-permanent or short-term property interest, such as a 55-year leasehold interest, to each of them because Article XII prohibits them from acquiring property interests only of a permanent or long-term nature. In support of this contention, the non-NMDs point to § 2411.

¶11 The non-NMDs concede that § 2411 does not apply here because Edives died prior to February 1984, the effective date of the Commonwealth probate code. They maintain, however, that the trial court should have invoked the concept imbedded in § 2411 to equitably grant each of them "the maximum allowable legal interest" or specifically, a 55-year leasehold interest, in the estate. The non-NMD grandchildren cite no authority for this proposition. Nor do they explain who would be the lessors and lessees and what would be the specific terms under the court created leasehold interest.

¶12 The trial court properly looked only to the applicable laws, Article XII and the TTC.[13] Article XII proscribes the "acquisition of permanent and long-term land interests" by non-NMDs.[14] "'[A]cquisition' includes all transfers by . . . inheritance."[15] The framers of the Constitution made one relevant exception to this

prohibition: a transfer to a spouse by inheritance.[16] The framers explained that "[t]his type of transfer is not considered an *acquisition* because property acquired or maintained by a married couple is usually supported by the labors of both spouses. When one spouse dies, the other spouse should be able to take over as owner of the family property."[17] They further specified that "[t]his exception does *not* apply to children because within the one or two generations likely to be affected by the restrictions in this article [XII] *nearly* all children of Northern Marianas descent landowners will qualify as persons of Northern Marianas descent who are eligible to inherit land."[18] The framers thus recognized that a few children would be ineligible to inherit.

¶13 ■ It is evident from the language of Article XII and its accompanying official analysis that the framers carefully considered what property ownership rights to extend, and correspondingly not to extend, to non-NMD relatives of NMDs. The framers did not carve out an exception to Article XII to authorize the inheritance of any interest in land -- whether short-term, non-permanent, or otherwise -- by non-NMD grandchildren of NMDs. Without more, we, like the trial court, are not at liberty to diverge from the framers' intent by creating short-term or non-permanent property interests and distributing them to the non-NMD grandchildren of NMDs.[19]

¶14 We hold, therefore, that the Superior Court did not err

---

■ (Dec. 6, 1976).

Leasehold interests "are those granted by contract for the possession and use of real property usually for a specified number of years." *Id.* at 170.

[12] *Estate of Imamura*, Civ. Action No. 89-1009 (N.M.I. Super. Ct. Feb. 17, 1995) (decision and order granting petition for partial distribution at 4-5).

[13] *Cf. Willbanks v. Stein*, 4 N.M.I. 205, 206 (1994) (order denying rehearing) (reiterating that the Commonwealth probate code is inapplicable and cannot be viewed as evidence of custom where decedent died prior to effective date of probate code).

[14] N.M.I. Const. art. XII, § 1.

[15] ANALYSIS OF THE CONSTITUTION OF THE COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS, 168 (Dec. 6, 1976); N.M.I. Const. art. XII, § 2.

[16] N.M.I. Const. art. XII, § 2.

[17] ANALYSIS OF THE CONSTITUTION OF THE COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS, 168 (Dec. 6, 1976). (emphasis added).

[18] ANALYSIS OF THE CONSTITUTION OF THE COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS, 168 (Dec. 6, 1976) (emphasis added).

[19] We note that under Trust Territory law applicable at the time of Edives's death, land ownership restrictions, authorized under the Trust Territory Bill of Rights, *see* 1 TTC § 13 (Michie Co. 1980), were already in place:

Only citizens of the Trust Territory or corporation wholly owned by citizens of the Trust Territory may hold title to land in the Trust Territory; provided, that nothing herein shall be construed to divest or impair the right, title, or interest of noncitizens or their heirs or devisees, in lands in the Trust Territory held by such persons prior to December 8, 1941, and which have not been vested in the alien property custodian . . . .

57 TTC § 201 (Michie Co. 1980). This provision not only expressly limited land ownership, but also implicitly recognized that impairment and divestiture of land rights could occur with respect to non-TT citizens whose rights vested, or otherwise would have vested, after December 8, 1941.

in concluding that the non-NMD grandchildren did not *acquire* any interest in Edives' estate through inheritance. The trial court's decision did not *divest* the non-NMD grandchildren of any vested property right. Rather, no such land interest was ever acquired and none ever vested.

## CONCLUSION

¶15 For the reasons set forth above, we hereby **AFFIRM** the decision of the trial court.

TAYLOR, Chief Justice, dissenting:

I respectfully dissent.

¶16 Contrary to the majority opinion, I believe Article XII of the Constitution of the Commonwealth of the Northern Mariana Islands was never drafted with the intent of disinheriting Chamorro children. Put more simply, Article XII was never meant to deny Chamorro grandchildren a right to inherit their grandmother's land simply because they are not currently a citizen or national of the United States. The majority's holding has the effect of denying the appellants basic, fundamental due process and equal protection of the laws in violation of the U.S. Constitution.

¶17 The majority reasoned that because "no one challenged the constitutionality of Article XII, § 4, which requires U.S. citizenship or national status for a person to qualify as an NMD," the majority declined to address this issue *sua sponte*.[20] I contend that the very definition of a person of Northern Marianas descent, which the majority concedes "may raise constitutional issues," is the very crux of this case and should have been addressed. The ramifications of the majority's holding raises serious conflicts with Article I, § 5 of the Commonwealth Constitution which mandates that "[n]o person shall be deprived of life, liberty or property without due process of law" and with Article I, § 6 which provides "[n]o person shall be denied equal protection of the laws." N.M.I. Const. art. I, §§ 5 & 6. These provisions are taken directly from the Fourteenth Amendment to the U.S. Constitution. Not only does the majority's holding contradict the Commonwealth Constitution, but runs afoul of the U.S. Constitution and with the legal relationship existing between the Commonwealth and the United States.

## FACTS

¶18 Edives, a Chamorro woman, died intestate. She had seven children. Two children, Jack Sablan Imamura ("Jack") and Maria Manglona Oghushi ("Maria"), left the Commonwealth to reside in Japan. Jack and Maria

---

[20] *See* Maj. footnote 2 (emphasis in original).

---

predeceased Edives leaving three and nine heirs respectively.[21] Jack and Maria bore grandchildren who are neither U.S. citizens nor U.S. nationals.[22] These grandchildren, the "appellants" in this appeal, whose alienage disqualifies them from Northern Marianas Descent ("NMD") status under Article XII, claim they have a right to inherit from their grandmother's estate and claim entitlement to a fifty-five year leasehold interest in two-sevenths of Edives' estate, under the principle, if not the express terms, of 8 CMC §2411.[23]

## ISSUE

¶19 Do Chamorro grandchildren, who meet the second prong of the definition of an "NMD" under Article XII, § 4, lose their rights to inheritance based upon alienage and citizenship? I believe that fundamental rights, such as the rights of inheritance, are never lost. It would be abhorrent to hold otherwise.

## ANALYSIS

### I. The Appellants Are of Chamorro Descent.

¶20 As an initial matter, the term "non-NMD," as used by

---

[21] Jack was survived by three children: Rumiko Akamatsu, Ruliko Adamatsu, and James Imamura. Maria was survived by nine children: Hideko Usui, Kazukiyo Ohgushi, Masao Ohgushi, Yoshie Ohgushi, Mieko Ohgushi, Hiroshi Ohgushi, Nobuko Morioka, Isamu Ohgushi, and Sueko Terai. *Estate of Imamura*, Civ. Action No. 89-1009 (N.M.I. Super. Ct. Feb. 17, 1995) (Notice and Petition for Partial Distribution at 2 n.2).

[22] The record is unclear as to whether all of Edives' grandchildren, the appellants, are not U.S. Citizens or U.S. Nationals. In Exhibit A of the Appellants' Excerpts of Record, James F. Imamura ("James"), a grandson of Edives, submitted a sworn, signed and notarized affidavit wherein he states that he is the son of Jack, and Jack became a naturalized U.S. Citizen on May 10, 1963, approximately 8 months before James was born in 1964. Excerpts R. at 22. James further swears that he is a permanent U.S. resident, "residing at 1833A Saratoga Street, Great Lakes, Il 60088 U.S.A." *Id.* Appellants further submit that "James Imamura being the child of a citizen of the United States became either a national or a citizen of the United States by operation of 8 U.S.C. §1401." Appellants' Opposition to Petition for Final Distribution, Excerpts R. at 21.

[23] 8 CMC § 2411 provides:

Whenever a person not of Northern Marianas descent takes title to real property under this code, he or she shall take the maximum allowable legal interest in the real property and the remaining property interest if any shall vest in the next closest heirs or devisees who can legally take title to the real property pursuant to Article 12 of the Commonwealth Constitution.

64

the majority, is inherently misleading. The majority repeatedly refers to the appellants here as "non-NMDs" because they do not fit the statutory definition of Article XII, § 4 which states that an NMD is a person who "is a citizen or national of the United States and who is of at least one-quarter Northern Marianas Chamorro or Northern Marianas Carolinian blood . . . ." There is hardly a mention in the majority opinion that if the appellants in this case were, instead of being citizens of Japan, citizens or nationals of the U.S., there would be no question the appellants would be able to inherit their grandmother's land. Appellants fit the second prong of the definition of an NMD since they are at least one-quarter Chamorro descent. Because of their citizenship status, however, the appellants are prohibited from inheriting their grandmother's land and are thus denied, basic, fundamental due process and equal protection of the laws.

## II. Pre-Code Intestate Succession: Common Law Applies.

¶21    U.S. common law, not Chamorro customary law, applies. Edives died prior to the enactment of the Probate Code, which came into force on February 15, 1984. 8 CMC §2102. The Superior Court thus properly ruled that §2411 is inapplicable because Edives died before its enactment.[24]

¶22    The majority cites the dictum of *Estate of Cabrera* for the proposition that under Chamorro custom, "when parents died intestate (without performing a partida) the heirs must divide the parents' land by their own agreement." *Estate of Cabrera*, 2 N.M.I. 203 (1991) (dictum). I am troubled with the majority's reading of *Cabrera* and with the majority's disregard for binding precedent already established and set forth by the very same majority in *Estate of Barcinas*, 4 N.M.I. 149, 152-53 (1994). The majority's finding of a Chamorro custom in footnote 10 that "under Chamorro custom, the NMDs may agree to give non-NMDs whatever interest Article XII does not prohibit. The court, however, has no legal basis to force such an agreement upon the children and

grandchildren" is without legal basis, and is therefore, unfounded.

¶23    Cabrera involved a partida case not an intestacy case.[25] The appellants in *Cabrera* contended that since decedent died without a formal will, "the court had no choice but to find and confirm, that the property of decedent passed at the time of his death in *equal shares*, per stirpes, to his descendants . . . " *Id.* (emphasis in original). The *Cabrera* court stated "[i]f [decedent] had died *intestate without designating any portion of his property to his children*, or if he had designated but his children failed to live thereon, then appellant's contention would have merit." *Id.* (emphasis added). Thus the *Cabrera* court by dictum stated that *if* Cabrera had in fact died intestate without designating any portion of his property to be distributed amongst his children, as was done here by Edives, the appellants' argument, that the land should be properly divided "in equal shares, per stirpes," would be the correct result. *Id.* Therefore, the majority's reading of Cabrera's dictum is erroneous. Furthermore, this Court revisited the intestacy issue in *Barcinas*, discussed more fully below, and ruled that Chamorro customary law does not dictate the rules of intestate succession, and applied the U.S. common law concept of advancements to an intestacy case. *Barcinas*, 4 N.M.I. at 153.

¶24    The parties do not dispute that Edives died intestate.[26] Intestacy, by definition, means the decedent dies "without leaving anything to testify what his wishes were with respect to the disposal of his property after his death."[27] As the *Barcinas* court stated, "[t]he forms of [Chamorro] customary distribution that we have recognized are partidas and testamentos.[28] Each is based upon the wishes and intent of the decedent." *Id.* However, where a decedent died intestate, "it necessarily follows that there

---

[24] *Estate of Tudela*, Civ. Action No. 86-0884 (N.M.I. Super. Ct. May 22, 1992) (Order). *rev'd on other grounds*, 4 N.M.I. 1 (1993), *appeal dismissed*, No. 93-16486 (9th Cir. Nov. 18, 1994), the Superior Court ruled that 8 CMC § 2411 violated Article XII of the Commonwealth Constitution. The court held that a non-NMD surviving spouse cannot take any interest in real property through intestate succession, reasoning that the widow's share by intestate succession constitutes a "transaction" under Article XII, § 6 and is therefore void ab initio. *Tudela*, Order at 9. On appeal. we vacated the trial court's judgment based on a separate issue and thus did not have occasion to consider the merits of the court's Article XII ruling. *Tudela*, 4 N.M.I. at 5-6.

[25] *Barcinas*. 4 N.M.I. at 153 n.5. "We clarify footnote 8 [citing *Cabrera*] by expressly stating that the wishes and intent of a decedent control in cases involving custom, such as partida or testimento, not in intestacy cases such as the one at hand." *Id.*

[26] *Estate of Imamura*, Civ. Action No. 89-1009 (N.M.I. Super. Ct. Feb. 17, 1995) (Notice and Petition for Partial Distribution, Excerpts R. at 11); Appellant's Opening Br. at 2.

[27] BLACK'S LAW DICTIONARY at 821 (6th ed. 1990).

[28] A partida "occurs when the father calls the entire family together and outlines the division of the property among his children." *Barcinas*, 4 N.M.I. at 152 n.4, citing *Estate of Deleon Castro*, 4 N.M.I. 102, 110 (1994). A testamento is a "written partida, which preserves in writing the intent and directions of the male head of the family in regards to distribution of the family's property." *Barcinas*, 4 N.M.I. at 152. n.4 citing *Deleon Castro* at 110.

was no testament, legal or customary, directing how [the] estate should be distributed." *Id.* at 153. *Barcinas* therefore held that customary law does not dictate the rules of intestate succession. *Id.* at 153.

¶25 Following this precedent, I submit that, prior to reaching the constitutional questions presented, we must first identify the applicable law concerning intestate succession, and determine the source of that law. Given that Chamorro customary law does not apply, that the Commonwealth Probate Code is inapplicable, and that the provisions of the Trust Territory Code[29] which governed probate matters prior to February 15, 1984, contain no provisions for intestate succession, we must look to "the rules of the common law, as expressed in the restatements of the law approved by the American Law Institute, and, to the extent not so expressed as generally understood and applied in the United States. . . ." 7 CMC § 3401. *See also Barcinas,* 4 N.M.I. at 153 (applying common law to issue of advancements in intestacy case). Thus, U.S. common law, not Chamorro custom, applies.

¶26 Of course, strictly speaking, the "common law of intestate succession" is an oxymoron. The laws of intestate succession are purely statutory in origin. *Irving Trust Co. v. Day,* 314 U.S. 556, 562, 62 S. Ct. 398, 401 (1941). These statutes have almost universally displaced the ancient canons of descent which governed inheritance of realty at common law. The former rules, which originated in England, "have not found favor in [the United States], and in the main have been rejected as being inconsistent with the character and policy of our institutions . . . ." 5 THOMPSON ON REAL PROPERTY § 2405 (Grimes replacement ed. 1979). Where the relevant common-law doctrines are no longer "applied in the United States," we have interpreted 7 CMC § 3401 to require an examination of the statutes of the fifty states, and the cases construing them, to determine the applicable law in the Commonwealth. *See Ada v. Sablan,* 1 N.M.I. 415, 425-27 (1990).

¶27 In general terms, the great majority of these statutes[30] accord with the prior case law in this jurisdiction, that under the basic rule of intestate succession, descendants of the decedent inherit in equal shares, per stirpes. *Muna v. Camacho,* 2 CR 10, 14 (N.M.I. Trial Ct. 1984). Thus, the estate is divided into shares equal to the number of children of the decedent; and where some of the children are already dead but left living grandchildren, those grandchildren receive their parents' intestate shares.

¶28 However, no case in this jurisdiction has yet considered the additional factor presented here, which is that the children of two of the seven intestate heirs are aliens. The rights of aliens to inherit realty in the United States have undergone considerable evolution over the past half-century, partly in response to expanding notions of constitutional due process and equal protection guarantees, which are discussed more fully below. Section 2-112 of the Uniform Probate Code, which had been adopted in fifteen U.S. jurisdictions by the date of Edives' death, provides perhaps the most representative product of this evolution: "[n]o person is disqualified to take as an heir because he or a person through whom he claims is or has been an alien." Uniform Probate Code § 2-112, in 8 UNIFORM LAWS ANNOTATED 70-71 (Master ed. 1983) The comment to this section describes its purpose as:

> to eliminate the ancient rule that the alien cannot acquire or transmit land by descent, a rule based on the feudal notions of the obligations of the tenant to the King. Although there never was a corresponding rule as to personalty, the present section is phrased in light of the basic premise of the Code that distinctions between real and personal property should be abolished.

*Id.* at 71.

¶29 Thus, as to aliens who are residents of the United States, laws of intestate succession no longer bar inheritance to aliens as a class, and most do not distinguish between real property from personalty in establishing the total value of the intestate estate. *Id.* at 56 (Comment to Part I, "*Intestate Succession*"); 10 THOMPSON (Thomas ed.), *supra,* § 89.04(d).[31] Considering these authorities, I submit that the law as generally understood and applied in the United States entitles aliens to inherit by intestate succession on the same footing as citizens.

¶30 However, our consideration of which common law principles we may adopt is not complete until we have considered their application in light of the Commonwealth Constitution. "The NMI Constitution is a paramount source of Commonwealth law, guaranteeing basic rights for all persons . . . . Our courts must be ever watchful when considering the application of common law principles that either on their face or as applied violate such rights." *Ada,* 1 N.M.I. at 427-428.

## III. Article XII.

---

[29] 13 TTC § 1 et seq.

[30] *See* 10 THOMPSON ON REAL PROPERTY § 89.05(c) (Thomas ed. 1994) (reviewing state statutes).

[31] However, some states still impose procedural burdens and other limitations on inheritance of land by nonresident aliens. 9 THOMPSON (Thomas ed.), *supra,* § 79.11. From the record here, at least one of Edives' alien heirs is a resident of the United States. *See* Affidavit of James F. Imamura, Excerpts R. at 22. The place of residency of the other heirs does not appear from the record.

¶31 Article XII, § 1 of the Commonwealth Constitution provides that "[t]he acquisition of permanent and long-term interests in real property within the Commonwealth shall be restricted to persons of Northern Marianas descent." N.M.I. Const. art. XII, § 1. Section 2 clarifies that this restriction applies to "sale, lease, gift, *inheritance* or other means." *Id.*, § 2 (emphasis added). Section 4 requires that, to qualify as an NMD, one must be a "citizen or national of the United States." *Id.*,§ 4. Since the appellants here are citizens of Japan, they do not qualify as NMDs and thus cannot take "permanent or long-term interests in real property within the Commonwealth," defined in Article XII, § 3 as "freehold interests and leasehold interests of more than fifty-five years including renewal rights." *Id.*, § 3. Finally, under the terms of § 6, any "transaction made in violation" of Article XII "shall be void ab initio." *Id.*, § 6.

¶32 I believe the framers of Article XII intended to allow non-NMDs to acquire and hold impermanent and short-term interests in land. As stated in the ANALYSIS OF THE CONSTITUTION, "the Convention spent a great deal of time and effort to find the least restrictive means of accomplishing its purpose." ANALYSIS OF THE CONSTITUTION OF THE COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS, 164 (Dec. 6, 1976). Our prior cases have upheld leasehold acquisitions by non-NMDs of up to fifty-five years. *See, e.g., Diamond Hotel Co., Ltd. v. Matsunaga*, 4 N.M.I. 213, 220-21 (1995). There is nothing in Article XII or the ANALYSIS which leads me to believe the framers intended to prevent non-NMDs from acquiring impermanent or short-term interests in property by intestate succession when they are plainly allowed to do so by commercial transaction, gift or testate inheritance.

¶33 The discussion of § 6 in the ANALYSIS bolsters this view:

> [Section 6] provides that any transaction made in violation of section 1 is void from the beginning and has no force or effect. This means that if a person sells land to a person who is not of Northern Marianas descent, that transaction never takes effect and never has any consequence with respect to the title of the land. The title remains in the person who tried to sell it. This section affects only title in land. It does not affect the cause of action that the buyer may have if the seller takes his money and then does not part with the title because the buyer is not a person of Northern Marianas descent. These causes of action would be governed by the general law of contracts.

This commentary makes clear that, rather than intending for § 6 to broaden the scope of prohibitions on transfers by intestate succession beyond those which governed commercial transactions, the framers intended for this provision simply to enforce the prohibitions of § 1 in the commercial context itself.

¶34 This language in the ANALYSIS also suggests the minds of the framers were focused on intentional, purposeful transactions, not involuntary transfers by operation of law. The language employed in § 6 itself corroborates this reading: it refers to "transactions *made*" in violation of § 1. The term transaction has a broad and flexible meaning in numerous legal contexts. *See Manglona v. Kaipat*, 3 N.M.I. 322, 334 (1992). However, it generally refers to some form of purposeful, intentional interchange between persons. *Cf. Shaneybrook v. Blizzard*, 121 A.2d 218, 221-22 (Md. 1956) ("transaction" does not include fortuitous and involuntary act for purposes of dead man's statute); *Franklin National Bank v. Krakow*, 295 F. Supp. 910, 917-18 (D.D.C.1969) ("transaction of business" under long-arm statute requires "purposeful activity" within forum state). Given this connotation of intentional activity, I suggest the framers did not intend for the remedy of § 6 to expand the sweep of Article XII beyond the "least restrictive means" delineated in §§ 1 through 4 in the special case of involuntary transfers by operation of law.[32]

¶35 This is not to suggest that, in interpreting Article XII, this Court would establish a class of "acquisitions" under § 1 which are not "transactions" under § 6, and thereby undertake a search for alternative remedies in dealing with such "non-transactional acquisitions." Indeed, I believe we should avoid such an undertaking. I *am* arguing, however, we should likewise avoid a construction of Article XII which expands its coverage beyond what the framers intended. And considering the above authorities, I submit the framers did not intend for Article XII to sweep more broadly in the context of intestate succession than it does in the context of intentional conveyances.

**IV. Article I**

---

[32] Further support in the ANALYSIS for this understanding of the framers' intent comes from the statement that implementation of Article XII was intended to err, if at all, on the side of allowing a few ineligible persons to own land:

> [T]he Convention recognized that no classification system based on neutral principles can be completely effective or error-free, including only those who should be included or excluding only those who should be excluded. The Convention has erred on the side of including a few persons who should be excluded rather than excluding any of those persons who should be included.

ANALYSIS, *supra*, at 167.

¶36 I submit there is an additional, compelling reason why we must not expand Article XII beyond the scope intended by the framers: any such expansion would interfere with appellants' other constitutional rights which are also at stake in this case. Article I, § 5 of the Commonwealth Constitution mandates "[n]o person shall be deprived of life, liberty or property without due process of law." N.M.I. Const. art. I § 5. Moreover, Article I, § 6 provides "[n]o person shall be denied equal protection of the laws." *Id.*, § 6. According to the ANALYSIS, these two provisions are taken from the Fourteenth Amendment to the U.S. Constitution, and in both cases "[n]o substantive change from section 1 of the Fourteenth Amendment or the interpretation of that section by the United States Supreme Court is intended." ANALYSIS OF THE CONSTITUTION, *supra* at 20, 21.

¶37 U.S. Supreme Court precedents hold that certain state actions which discriminate against persons on the basis of alienage or national origin, including those which prohibit land ownership, violate the Equal Protection Clause of the Fourteenth Amendment. *See Oyama v. California*, 332 U.S. 633, 68 S. Ct. 269 (1948) (alien land laws)[33]; *Takahashi v. Fish and Game Comm.*, 334 U.S. 410, 68 S. Ct. 1138 (1948) (fishing license restrictions).

¶38 Of course, not all classifications affecting alienage are unconstitutional. *See, e.g., Cabell v. Chavez-Salido*, 454 U.S. 432, 102 S. Ct. 735 (1982) (permitting alienage classifications which are "bound up with the operation of the State as a governmental entity"). Moreover, one court has held that classifications prohibiting some types of land ownership by *non-resident* aliens are permissible under the Fourteenth Amendment. *See Shames v. Nebraska*, 323 F. Supp. 1321, 1333 (D. Neb. 1971), *aff'd mem.*, 408 U.S. 901, 92 S. Ct. 2478 (1972). Nevertheless, at least one of the appellants here, James F. Imamura, is a resident of the United States. Imamura Affidavit, *supra*, Excerpts R. at 22. He is therefore entitled to the full measure of equal protection and due process of law guaranteed by Article I.[34]

---

[33] While the plurality opinion in *Oyama* did not expressly declare California's alien land law unconstitutional, the concurring opinions of four Justices did so, *see Oyama, supra*, 332 U.S. at 647 (Black & Douglas, J.J., concurring); *id.* at 650 (Murphy & Rutledge, J.J., concurring), and the California Supreme Court struck the statutes down on Fourteenth Amendment grounds in an en banc ruling four years later. *Sei Fuji v. California*, 242 P.2d 617, 630 (Cal. 1952).

[34] Moreover, I submit that a holding by this Court which allowed James Imamura to inherit as a resident alien while denying any inheritance to his non-resident siblings and cousins would serve no rational purpose. In Article XII, the framers of the Commonwealth provided us with criteria for distinguishing

## V. Reconciling the Constitutional Imperatives.

¶39 The above discussion of the personal rights guaranteed in Article I of the Commonwealth Constitution is not intended to call into question the validity or vitality of Article XII. The constitutionality of the Commonwealth's land alienation restrictions is beyond dispute. *See Wabol v. Villacrusis*, 958 F.2d 1450 (9th Cir. 1990). More importantly, the need for full enforcement of Article XII, in the face of the extremely rapid cultural, economic and social changes taking place in the Commonwealth, cannot be denied. The objective of protecting the indigenous peoples of the Commonwealth from the loss of their "cultural anchor," land, is arguably as compelling today as it was when Article XII was first enacted. *See Diamond Hotel, supra*, 4 N.M.I. at 217.

¶40 Still, I strongly believe that, precisely where Article XII's restrictions on land alienation leave off, Article I's protections of personal rights begin. There is no vacant space separating these competing imperatives.

> Our task must be to reconcile, and give effect to, both sets of provisions. In doing so, we must recognize that the article XII restrictions on alienation inherently impinge upon the article I protections of due process and equal protection to purchase, lease, sell, hold and convey property. To the extent the article XII restrictions are expanded, the rights available under article I are commensurately reduced.

*Ferreira v. Borja*, 2 N.M.I. 514, 544-45, *rev'd*, 1 F.3d 960 (9th Cir. 1993) (King, J., dissenting). Moreover, while the Ninth Circuit in *Ferreira* has previously visited the issue of the conflict between Article XII and Article I, there is no mention of the "right to inherit" or of "inheritance" as a permissible Article XII restriction on alienation, or, for that matter, whether Article XII's restrictions affecting the right to inherit improperly impinge upon the basic, fundamental protections of due process and equal protection. *Id.* The question remains whether the Ninth Circuit Court of Appeals intentionally excluded inheritance from its category of permissible impingements.

---

those who can own land from those who cannot. The criterion which applies to this case is citizenship versus alienage, not residency versus non-residency. Article I of the Constitution requires us to protect the inheritance rights of a resident alien up to the limit imposed by Article XII. There is no policy basis for this Court to adopt a rule which would exclude the others. Indeed, considerations of simplicity and consistency in application would favor a rule that treated all NMD heirs alike, even if the Constitution does not mandate such treatment in all cases.

## VI. Intestate Succession in Light of Constitutional law.

¶41 The need to reconcile these competing constitutional imperatives requires us, I believe, to consider further the rules of intestate succession discussed above. Specifically, we have a duty to construe these rules in a manner consistent with the various provisions of the Commonwealth Constitution. *Ada, supra*, 1 N.M.I. at 427-28.

¶42 In order to comply with this mandate, I would propose the following holding: at the death of an intestate decedent, any non-NMD who would otherwise take a share of real property in fee simple takes instead a permissible estate for a term of fifty-five years' duration in such an amount as to give that person a property interest worth his or her full intestate share. The basic rule that all intestate heirs inherit equally would be preserved, subject to the constitutional requirement that non-NMDs may not take their shares in the form of permanent or long-term interests in real property.

¶43 As I envision this rule, it would operate as a starting point for the probate process, not as a basis for actual distribution. It would define those rights which vest at death. The probate court would then be free to arrive at an equitable distribution of estate assets, based upon the facts of each case, the relations between the heirs, the nature of the property contained in the estate, and any other pertinent considerations.

¶44 Such powers of equitable distribution are plainly within the power of the probate court. *See* Com. R. Prob. P. 22 (empowering probate court to make "such orders as are necessary to close the estate"); *Estate of Kunzler*, 699 P.2d 1388, 1391-92 (holding that Uniform Probate Code § 3-911 gives probate court power to sell "any property which cannot be partitioned without prejudice to the owners and which cannot conveniently be allotted to any one party"). This type of determination would be difficult at times, but not of a different character from the problems of equitable distribution probate courts face every day. And as this Court has stated repeatedly, "the fact that 'troublesome' difficulties may arise does 'not permit us to disregard the mandate of Article XII.'" *Ferreira, supra*, 2 N.M.I. at 543 (King, J., dissenting), *citing Aldan-Pierce v. Mafnas*, 2 N.M.I. 122, 163 (1991).

¶45 Appellees argue against such a holding on the ground that it would effectively "rewrite Chamorro customary law." Br. of Appellee at 10. They also cite the holding of *Diamond Hotel, supra*, 4 N.M.I. at 219-20, that a court may not reform the provisions of a void instrument. A related possible objection, not interposed by the parties, is that by the holding proposed above the Court would exceed the permissible limits of statutory construction. *See In re Seman*, 3 N.M.I. 57, 74 (1992) (cautioning that courts cannot rewrite statutes in order to preserve their constitutionality). I do not find these arguments persuasive.

¶46 First, as shown above, Chamorro custom does not provide the operative law in cases of intestacy such as this one. *Barcinas, supra*, 4 N.M.I. at 152-53. Rather, it is the common law which governs. Second, we are not dealing with a contract or other instrument between parties; therefore, the rule against judicial reformation of contracts certainly is not applicable. Nor are we dealing with an enactment of our legislature. Rather, we are construing the common law as it has been supplanted by statutory law with variations across the fifty states. It is the proper role of this Court to interpret the common law and to adopt a rule which is consistent with the provisions of our Constitution.

¶47 In more fundamental terms, these objections are based on a grave misconception of what I see as the core principle of this case. Chamorro customary law is based on respect for the intent of the decedent. *Barcinas, supra*, 4 N.M.I. at 152. The rule against judicial reformation of contracts cited in *Diamond Hotel* is likewise based on the notion that a court cannot vary the terms of the parties' intent as expressed in their written instruments. And the rule in *Seman* against rewriting a statute is rooted in the need for courts to respect the intent of the legislature which wrote the law. However, in this case, we have before us *no evidence of anyone's intent* -- neither of Edives, nor of any contracting parties, nor of the Commonwealth legislature -- as to how this property should be distributed. Absent even a scintilla of such evidence, it seems to me that there is no legal, equitable or policy basis for us to adopt a rule of intestate succession which violates Article XII, § 1 and thereby renders that same rule void ab initio under § 6. Rather, I believe there is a clear alternative which does not result in a constitutional violation which should have been adopted by this Court.

## CONCLUSION

¶48 For the foregoing reasons, I would reverse the judgment of the Superior Court and hold that, at Edives' death, appellants acquired a permissible estate for a term of fifty-five years' duration, valued at two-sevenths of the total value of her estate. I would remand this matter to the probate court for equitable distribution of the estate among the heirs, such distribution to be based on the agreement of the heirs or upon evidence produced at trial.